## ARGUED AND DETERMINED

IN THE

# SUPREME COURT OF TENNESSEE

FOR THE

## MIDDLE DIVISION.

---

## NASHVILLE, DECEMBER TERM, 1908.

---

NASHVILLE, CHATTANOOGA & ST. LOUIS RAILWAY COMPANY *v.* BOARD OF EQUALIZATION FOR ASSESSMENT OF RAILROAD PROPERTY.

*(Nashville.* December Term, 1908.[1])

1. **TAXATION.** Of railroad property as "distributable property" and as "localized property" under Acts 1897, ch. 5.

   The statute (Acts 1897, ch. 5), requiring (in sec. 2) railroads to file schedules setting forth the length in miles of its entire roadbed, switches, and side tracks, showing the number of miles in this State, in each county and in each incorporated town in this State, and the value of the whole, and providing (in sec. 6) that the road (meaning the roadbed) of any rail-

---

[1] The opinion in this case, as well as that in the following case, was delivered in July, 1909, at an adjourned term as a continuation of the December Term, 1908.—REPORTER.

[(1)]

Railroad v. Board.

road shall include all side tracks, switches, etc., and (in sec. 7) providing that the roadbed, rolling stock, franchises, choses in action, and personal property having no actual *situs* shall be known as "distributable property," and shall be valued separately from the other property, and providing (in sec. 8) that the depot buildings and other property—real, personal and mixed—having an actual *situs* shall be known as the "localized property," and shall be valued separately accordingly as the same may be located in any of the counties or incorporated towns in this State, divides the taxable railroad property into "distributable property" and "localized property"; and the side tracks, switch tracks, and industrial tracks off the main right of way, but used as a part of the general system, and for the same purposes as such tracks on the main right of way are used, must be assessed for taxation as "distributable property" within the meaning above given, and not as "localized trackage off the main right of way"; but all buildings, coal bins, roundhouses, machine shops, depot buildings, and other structures located on the terminal yards must be assessed as "localized property."

Acts cited and construed:  Acts 1882 (ex. ses.), ch. 16, secs. 2-4; Acts 1897, ch. 5, secs. 2, 6-8.

Cases cited and approved:  Franklin Co. v. Railroad, 12 Lea, 521; State Railroad Tax Cases, 92 U. S., 575; Railroad v. Wright, 151 U. S., 470; Railroad v. Backus, 154 U. S., 421; Railroad v. King, 57 C. C. A., 278, 120 Fed., 614; Porter v. Railroad, 76 Ill., 561; Railroad v. People, 205 Ill., 296; Dubuque v. Railroad, 47 Iowa, 196; Pfaff v. Railroad, 108 Ind., 144; State, ex rel., v. Railroad, 135 Mo., 618; State, ex rel., v. Railroad, 162 Mo., 391; Railroad v. Miller, 67 Ark., 498; Railroad v. Lancaster Co., 15 Neb., 252; Red Willow Co. v. Railroad, 26 Neb., 660.

2.  **SAME.  Same.  Assessment of "distributable property" of a railroad as "localized trackage" is absolutely void, and no taxes can be collected thereon.**

Where the side tracks, switch tracks, and industrial tracks off the main right of way of a railroad are separately and erroneously

assessed as "localized trackage off the main right of way," where-as they should have been assessed as "distributable property" of the railroad under a statute (Acts 1897, ch. 5) providing for the assessement of railroad property, such separate assessment is absolutely void, and no tax can be collected on such assessment as for distributable property. (*Post, pp.* 13, 14, 41, 42.)

### FROM DAVIDSON.

Appeal from the Circuit Court of Davidson County. T. E. MATTHEWS, Judge.

CLAUDE WALLER, for plaintiff.

ATTORNEY-GENERAL CATES and JAMES C. BRADFORD, for defendants.

MR. JUSTICE MCALISTER delivered the opinion of the Court.

This cause is before the court on the cross-appeals of the Nashville, Chattanooga & St. Louis Railway Company and the board of equalization from a judgment of the circuit court of Davidson county quashing an assessment of certain alleged localized property of the railroad, on account of vagueness and indefiniteness in the description of the property assessed. The main controversy, however, presented on the record, is whether the property involved should have been assessed as localized or distributable property. The genesis of the controversy, as well as its progress and

development, may be thus stated: On August 1, 1907, the railroad commission made the following order, to-wit:

The commission took up the petition of Mayor Frierson and City Attorney Chamlee, of Chattanooga, in regard to the assessment of the yards and terminals of railroad companies as localized property, and, after considering the opinion of the attorney-general of the State in the case, the petition was granted.

The commission proceeded to the consideration of the method to be pursued in assessing the trackage of railroads off the main right of way as localized property, and decided to value and assess it as railroad track on a mileage basis, whereupon the following order was adopted:

"That every railroad company doing business in Tennessee be required to file a statement under oath on or before August 15, 1907, setting forth the number of miles of side track, switch track, and spur track owned by it in the State of Tennessee, exclusive of such track on the main right of way; the statement to show the number of miles of such track in each county and municipality through which the road runs, together with the value of same.

"It is further ordered that each and every railroad company owning terminal yards and switch yards, or switch yards, be required to file with with this commission as a part of its returns a blue print, or blue prints, showing the main line, side tracks and switches, and such terminal yards and switch yards."

Railroad v. Board.

In pursuance of this order the following letter was addressed to the tax agent or other representative of each railroad company doing business in Tennessee, who has been heretofore designated to make out, swear to, and return the tax schedules to the comptroller of the State treasury for the use of the commission making the assessment of railroad property for the years 1907 and 1908:

"Dear Sir: The attorney-general of the State holds that, under the law, this commission must assess [as] localized property, all the side tracks, spur tracks, and switch tracks off the main right of way of all railroads in Tennessee. To secure the information necessary to complete the assessment, the commission has entered an order on its records, requiring returns to be made to the commission by all railroads in Tennessee, on or before August 15, 1907, under oath, giving the number of miles of such side track, spur track, and switch track belonging to each road in Tennessee that is off the main right of way, and to report the number of miles of such track in each county and municipality in Tennessee through which the road runs, with the value in each instance of such track, the report to be accompanied by a blue print, showing the main line and side tracks in all switch yards as terminal yards."

The schedules and blue prints were accordingly filed by the railroad authorities. The following assessment was then made of

---

Railroad v. Board.

---

LOCALIZED TRACK OFF MAIN RIGHT OF WAY.

Value of localized track off main right of
way ...... .... .... .............. $331,155 50

LOCALIZED TRACK APPORTIONED TO COUNTIES.

Localized track in Davidson county, 12.40
miles .......... ............. ......... $169,634 00

Localized track in Davidson county, 3.25
miles, being one-half the mileage of the
Louisville & Nashville Terminal Com-
pany .......... ........... ........     82,461 50

Total localized track, Davidson county,
15.65 miles ........ ............... $252,095 50

Total localized track, Rutherford county,
ty, 1.33 miles ....................      2,660 00

Total localized track, Bedford county, 0.07
miles .................. ......... ...       140 00

Total localized track, Franklin county,
2.23 miles ................:...........     4,460 00

Total localized track, Marion county, 0.18
miles ........ ......... ............       360 00

Total localized track, Hamilton county,
12.37 miles .................... ....     71,440 00

LOCALIZED TRACK APPORTIONED TO MUNICIPALITIES.

In Nashville, Nashville, Chattanooga & St.
Louis proper, 12.30 miles ............ $169,434 00

In Nashville, one-half interest in Louis-
ville & Nashville terminal, 3.25 miles ..    82,461 50

Total localized track in Nashville, 15.55
miles .......... ......... ....:...... $251,895 50

Railroad v. Board.

| | |
|---|---|
| Total localized track in Murfreesboro, 1.33 miles ................. ........ | 2,660 00 |
| Total localized track in Bell Buckle, 0.07 miles ............. ............. .... | 140 00 |
| Total localized track in Decherd, 0.25 miles ........ ................... | 460 00 |
| Total localized track in Chattanooga, 9.19 miles ........ .............. ....... | 65,080 00 |

CONCLUSIONS.

| | | |
|---|---|---|
| Value entire distributable property of this division (151.15 miles) ......... | | $5,140,100 00 |
| Value entire property in Tennessee ............. | | 5,474,749 50 |
| Less exemptions ......... | $ 1,000 00 | |
| Less localized track off main right of way ........... | 331,155 50 | |
| Less other localized property ........ .......... | 889,594 00 | |
| Value remaining distributable property in Tennessee ........ ........... | | 4,233,000 00 |
| Value distributable property per mile (124.50 miles) | | 34,000 00 |

After the work of the railroad commission had been completed, the petitioner filed its exception to the action of that body as to the assessment of all of its property, and specifically excepted to the assessment of "localized track off main right of way" in the following language:

"The honorable railroad commission in making the assessments of the several divisions of the Nashville, Chattanooga & St. Louis Railway within the State of Tennessee has divided the said property in the following classes, to wit: (1) Localized property; (2) localized trackage; (3) distributable property. In the division known and designated as "localized trackage" it has undertaken to assess separately and distinctly from the road itself certain tracks, switches, ties, rails, and the superstructure thereon, together with the property upon which they are located, and has specifically assessed this company as follows on localized trackage:

On the main line—that is, the line running
    from Nashville to Chattanooga—it has
    assessed what is designated as local-
    ized trackage at the sum of .........$331,155 50
On the Western & Atlantic Division it has
    assessed localized trackage at the sum
    of ........ ........................  32,980 00
On the Middle Tennessee & Alabama
    Branch it has assessed localized track-
    age at the sum of..................    200 00
On the West Nashville Branch it has as-
    sessed localized trackage at the sum of  13,850 00
On the Centreville Branch it has assessed
    localized trackage at the sum of ......  17,025 00
On the Sequatchie Valley Branch it has as-
    sessed localized trackage at the sum of  30,875 00

Railroad v. Board.

On the Tracy City Branch it has assessed
    localized trackage at the sum of ..... 35,575 00
On the Columbia Branch it has assessed lo-
    calized trackage at the sum of ........ 3,940 00
On the McMinnville Branch it has assessed
    localized trackage at the sum of...... 6,225 00
On the Lebanon Branch it has assessed lo-
    calized trackage at the sum of .... 600 00
On the Shelbyville Branch it has assessed
    localized trackage at the sum of..,... 1,475 00
On the Paducah & Memphis Division it has
    assessed localized trackage at the sum
    of .. .... ... ... ... ... .......... 7,775 00
On the Northwestern Division it has as-
    sessed localized trackage at the sum of 44,333 00

"All of said localized trackage is property that is completely covered by tracks, switches, ties, rails, and the superstructure thereon, and is used, not in the performance of local business, but in the handling of the general business of the company on each of the said branches. Said trackage is used precisely for the same purposes and in the same manner as the trackage on the main right of way of each of the several divisions of the company's property. The honorable railroad commission has seen proper to class all trackage— including tracks, switches, ties, rails, and the superstructure thereon—located upon the right of way of each of said divisions as a part of the distributable property of said company, but has assessed all of said trackage off of said right of way as localized trackage.

"It is respectfully submitted that there is nothing in the act under which this honorable railroad commission assesses the property in question which justifies it in assessing any of said tracks, switches, ties, rails, and superstructure thereon off of the right of way as localized property, but that under and by the express terms of the act—being chapter 5 of the Acts of 1897—said property is a part of the distributable property, and must be assessed as a whole in connection with each division. Said act provides that 'the roadbed, rolling stock, franchises, choses in action and personal property of a railroad property having no actual *situs,* shall be known as distributable property and shall be valued separately from the other property.' And section 6 of said act provides that 'the road of any railroad property shall include all side tracks, switches, bridges, trestles, ties, rails, and superstructure of every kind.' All of said localized trackage as above assessed is a part of the distributable property of each of the several divisions that have been assessed, and the assessment of said side tracks, switches, bridges, ties, rails, and superstructure thereon as localized property is unauthorized and void.

"The Nashville, Chattanooga & St. Louis Railway, therefore, excepts to all of the assessments designated as 'localized trackage' because said assessments are wholly void and unauthorized by the act under which the honorable railroad commission is proceeding. For proof as to the character of said localized trackage, ref-

erence is hereby made to the proof already on file before the honorable commission."

This exception was specifically overruled by the railroad commission.

When the railroad commission had finally completed its work and overruled the exceptions of the petitioner, the record reached the hands of the board of equalization in the manner designated by the statute, and before that body the exception to the assessment of localized trackage off main right of way was renewed, but was overruled by that board, viz.:

"In the matter of the assessment of side tracks, spur tracks, switch tracks, and yards outside the main right of way of the . . . Nashville, Chattanooga & St. Louis . . . (the same having been assessed and denominated as 'localized trackage' by the State tax assessors), the board heard the arguments of counsel and upon consideration thereof and the whole record did confirm the assessment, as localized property, of said side tracks, switch tracks, spur tracks, and yards as the same had been made by the railroad commission, acting *ex officio* as State tax assessors of railroad property."

The assessments made by the railroad commission of localized property and distributable property were also approved by the board of equalization and certified to the comptroller.

The assessments of "localized track off main right of way" were not certified to the comptroller, because of

the fact that the Nashville, Chattanooga & St. Louis Railway filed in the circuit court of Davidson county a petition for *certiorari* and *supersedeas*.

The prayer of the petition is as follows:

"Premises considered, your petitioner prays that proper process issue making the above-named defendants parties hereto, and that a writ of *certiorari* issue against the defendants to produce into this honorable court the minutes, orders, proceedings, records, and proof, including all maps and other evidence as to the assessments of the property of the petitioner now on file with the board of equalization and in the hands of the defendant Malcolm R. Patterson, and that a writ of *supersedeas* issue to supersede the assessments by the said board of equalization of the side tracks, switch tracks, spur tracks, industrial tracks, and yards, outside of petitioner's main right of way, as localized property, and to restrain the certification of the same, but not to restrain or stay the certification of the remainder of the assessments made by the board of equalization of the petitioner's property, and that on final hearing the assessment of said side tracks, switch tracks, spur tracks, industrial tracks, and yards of your petitioner, situated outside of the petitioner's main right of way, as localized property, be declared to be illegal, null, and void, and that said assessment itself be declared to be illegal, null, and void, as not authorized by the act, chapter 5 of the Acts of 1897. Petitioner prays for such other and further general relief as the circumstances may require."

Railroad v. Board.

It is said on behalf of the State that "localized track-age off the main right of way" does not simply embrace side tracks and spur tracks, but includes the real estate on which said side tracks and spur tracks are located. It is said the land and the said road tracks traversing it are the constituent elements of valuation, and are inappropriately designated "localized trackage." The insistence of the State is that the so-called localized trackage at Chattanooga and Nashville is shown to be several tracts of land, comprising many acres, upon which are built shops, roundhouses, and other buildings, and also railway tracks used for switching and parking cars and other incidental and convenient uses. The railroad commission ascertained the number of miles of railroad track on each lot, and in making the assessment considered the individual value of the land and the tracks. This is shown by the following extract from the brief of the railroad commission, which is filed as an exhibit to its answer, viz.:

"In assessing localized tracks, the commission has taken into consideration the value of the ground and the value of the superstructure. This makes a wide difference in the valuation placed upon the side tracks in the city and in the country, on account of the high valuation placed on city property as compared with country property."

It is to be noted in this connection that these several tracts, upon which were situated the railway side tracks, were not assessed under the head of localized

property, as other real estate is assessed.    In other words, if they were not assessed as localized trackage, they were not assessed at all.

The said properties are thus described in the answer and return of board of equalization:·

### "LOCALIZED TRACKAGE IN THE CITY OF CHATTANOOGA AND HAMILTON COUNTY.

"As hereinbefore adverted to, it was shown by proof taken by the board of assessors, under the controversy before said board between the municipal authorities of Chattanooga and petitioner, that petitioner was and is the owner of fourteen acres of land lying practically in the heart of the city of Chattanooga, and in control, under lease from the State of Georgia, of about ten acres adjoining the aforesaid fourteen-acre tract, which was used as the yards of the Nashville, Chattanooga & St. Louis Railway and of the Western & Atlantic Railroad, which yards were largely covered by tracks, some of which were used for switching purposes, but the major portion of which (particularly on the ten-acre tract) were used for storage purposes and for repairing cars, and that on the fourteen-acre tract was located a machine shop, a turntable, or uncovered roundhouse, bins for the storage of coal, a sandhouse, an office building, and perhaps some other structures."

Again the answer avers, on the subject of localized trackage in Nashville:

"Further, it will be seen by an inspection of Exhibit

Railroad v. Board.

No. 10 hereto, in connection with Exhibit No. 12 here-
to, that the five several tracts of land bounded in red as
shown upon said Exhibit No. 10, all owned by petitioner
and containing 25.80 acres, were reported by petition-
er's engineer, Trabue, as having on them 12.07 miles of
track, and that, in addition to this track there were
three separate industrial tracks leading, one to the
Cumberland Mill, another to the Model Mill, and the
third to the National Fertilizer Works, aggregating .33
miles of track, and this, added to the 12.07 miles of
track above referred to, aggregated 12.40 miles, which
the board of assessors valued and assessed as 'localized
trackage' belonging to petitioner in the city of Nash-
ville.

"Further, it will be seen by an inspection of said Ex-
hibit No. 10 hereto that there are six separate tracts
of land designated on said map and bounded by yellow
lines, which several tracts aggregate 28.66 acres, and
are owned by the Louisville & Nashville Terminal Com-
pany, but leased to the petitioner and the Louisville &
Nashville Railroad. As located upon these six separate
tracts of land, petitioner's engineer, Trabue, reported
6.5 miles of track, and one-half this mileage, to wit, 3.25
miles, the board of assessors assessed against petitioner,
without any further description of said six several
tracts of land, and without showing upon which of said
tracts said 3.25 miles of trackage were located.

"No map showing location of the 'localized trackage'
assessed against petitioner on account of its Northwes-

tern Division was furnished by petitioner, but an inspection of Exhibit No. 19 hereto shows that the 'localized track' assessed against petitioner on account of its Northwestern Division in the city of Nashville and in the county of Davidson aggregating 10.85 miles.

"Exhibit C to Trabue deposition, Exhibit No. 12 hereto, p. 5, shows that this 'localized track,' aggregating 10.85 miles, covers some 12 industrial tracks leading from petitioner's property to different manufacturing or other business establishments, and the shops belonging to petitioner's Northwestern Division upon the shop track. Petitioner's engineer reports 8.12 miles of track, but does not give the acreage of this tract."

As to the other properties, the answer further states:

"Respondents deny that the assessment or valuation of petitioner's property, assessed as aforesaid under the name or classification of 'localized trackage' was included either by the board of assessors or by your respondents in the assessment and valuation of petitioner's distributable property, and this is clearly shown in Exhibit No. 15 to this answer and return; and the respondents also deny that said localized property so assessed as 'localized trackage' ought to have been included within the assessment and valuation of petitioner's distributable property, because, as respondents aver, said property is 'localized property,' as defined by section 8 of chapter 5 of the Acts of 1897.

"Respondents also deny that the assessment of peti-

tioner's localized property under the name and classification of 'localized trackage,' as hereinbefore shown, was or is void, and deny that the petitioner is entitled to have said assessment set aside and annulled, or that it is entitled to any of the relief prayed in its petition."

The answer further avers:

"After the board of assessors had called upon petitioner for a supplemental statement, said petitioner filed as Exhibit B to the 'deposition' of its engineer, Trabue (which Exhibit B is said Exhibit No. 11 to this answer and return), a copy of said map, Exhibit No. 2 hereto, and designated thereon in black lines what said Trabue called the right of way (200 feet in width) of the Nashville, Chattanooga & St. Louis Railway, and also a right of way of like width of the Western & Atlantic Railroad. Said Trabue also designated by red lines that part of said yards not included within the alleged rights of way of said petitioner and of the Western & Atlantic Railroad. An inspection of said Exhibit No. 11 hereto will show that petitioner's alleged right of way, as laid down by Trabue—which was done without other evidence of the existence or extent of said right of way than his simple declaration—was made to include, not only the Union Depot train shed, but a considerable part of petitioner's freight depot; and the right of way of the Western & Atlantic Railroad, as designated by said Trabue, in the same manner was made to include the principal part of the 10 acres leased by the petitioner from the State of Georgia, and which

the proof shows was and is covered with tracks used principally for storage purposes.

"LOCALIZED TRACKAGE IN NASHVILLE—CHATTANOOGA DIVISION.

"An examination of Exhibit A to Trabue's deposition (Exhibit No. 10 to this return and answer) will show that petitioner's engineer, Trabue, laid down and designated a right of way for petitioner two hundred feet in width bounded by black lines. However, there is no other evidence of the location or width of all this alleged right of way except the mere declaration of Mr. Trabue. But said right of way, as laid down on said map, said Exhibit No. 10 hereto, was made to include the principal part of petitioner's freight depot, its entire general office building, a considerable part of a number of wholesale warehouses, part of the Union Station, the baggage, mail, and express building, and perhaps some other structures, all 'localized property' in character and use."

An examination of the assessment actually made by the railroad commission will show that the value of the ground upon which the general office building of the company at Nashville was located, being in the right of way laid off by the engineer, was deducted and included in the class of distributable property assessed, and only the value of the buildings was assessed as localized property.

Another item is 5.58 acres between Cedar and Church streets in Nashville. In regard to this the assessment

of the railroad commission finds .5 of an acre on the so-called right of way, which it values at $3,000, and deducts it from the valuation of the whole.  And so, also, the land, .97 acre, between Church and Broad streets, upon which is built the freight depot, being within the right of way delimited on the map, is deducted from localized property and thrown into distributable property, and only the value of the super-structure is assessed as localized property.

We have made this elaborate statement of the action of the railroad commission, approved by the State board of equalization, in order to intelligently present the questions of law arising on the record.  It has already been stated that the complaint of the railroad presented in its petition for *certiorari* is directed to the "assessment of its side tracks, switch tracks, spur tracks, industrial tracks, and yards outside of its main right of way as localized property."  The law governing the assessment of railroad property for taxation is chapter 5, p. 102, Acts 1897, and is entitled:

"An act to provide just and equitable laws for the assessment and collection of revenue for State, county and municipal purposes whereby revenue is collected from the assessment of railroad, telegraph and telephone properties in the State of Tennessee."

And sections 6, 7, and 8 of that act are as follows:

"Sec. 6.   That the road of any railroad property shall include all said (side) tracks, switches, bridges trestles, ties, rails and superstructure of every kind.
:   .   .

"Sec. 7. That the roadbed, rolling stock, franchises, choses in action and personal property of a railroad property having no actual *situs,* shall be known as distributable property, and shall be valued separately from the other property; and after ascertaining the total value of such distributable property wherever situated, and after having deducted from this value $1,000, said assessors shall divide the remainder by the number of miles of the entire length of the road, and the result shall be the value per mile of such distributable property for the purpose of taxation; and the value per mile of such distributable property shall be multiplied by the number of miles in this State, and the product thereof shall be the sum to be assessed against such property for State purposes; and the value per mile so ascertained shall be multiplied by the number of miles in each county or incorporated city, and the product shall be the amount to be assessed upon such property by said counties and incorporated towns respectively.

"Sec. 8. That the depot buildings and other property, real, personal and mixed, having an actual *situs,* shall be known as the localized property of such railroad, and shall be valued separately accordingly as the same may be located in any of the counties or incorporated towns in this State."

Now, it will be observed that by the terms of this act all railroad property for the purposes of taxation is divided into two classes, localized and distributable. There is no classification of "localized trackage off the

main right of way." No such nomenclature appears anywhere in the act, yet the railroad commission assessed the property of this company under three heads: (1) Localized property; (2) distributable property; (3) localized trackage off the main right of way. Under this head the commission assessed for taxation, as localized property, every side track, every spur track, every switch track, every industrial track, located off the main right of way of the Nashville, Chattanooga & St. Louis Railway. In other words, the commission adopted the margin of the right of way as the line of cleavage, and all side tracks, spur tracks, and switch tracks inside this delimited line were assessed as distributable property, and all such tracks outside this arbitrary line were assessed as localized property. Section 7 of the act of 1897 provides: "That the roadbed, rolling stock, franchises, *choses* in action and personal property of a railroad property having no actual *situs* shall be known as distributable property and shall be valued separate from the other property," etc. Section 6 of the act of 1897 defines the roadbed of a railroad, viz.: "That the road of any railroad property shall include all side tracks, switches, bridges, trestles, ties, rails and superstructure of every kind." Section 8 of the act of 1897: "That the depot buildings and other property, real, personal and mixed, having an actual *situs*, shall be known as the localized property of sail railroad," etc. It thus appears that by plain statutory definition the roadbed includes "all side tracks and switches," and the direction of the statute

is that the roadbed shall be assessed as distributable property. Is there any authority under the statute for making another classification of side tracks and switches, outside of the main right of way, as localized property? The proof in the record is to the effect that these side tracks and switches are auxilliary to the main line and form a constituent and component part of the railway system. The terminal yards of a railroad are frequently a network of side tracks, switches, and turnouts; nor are they exclusively used for local business. They are used to facilitate the transportation of trains engaged in interstate, as well as intrastate, commerce. Yet, the railroad commission assessed these side tracks, switches, and spur tracks as localized property, regardless of their connection with the main line and the purposes of their construction. The proof is that these side tracks are used as part of a general system and for all purposes necessary in operating the railroad. According to the proof the side tracks and switch tracks located off the right of way are used for the same purposes as those that are located on the right of way. They are all operated indiscriminately as one system, and to transact the general business of the company. As to the industrial tracks, the proof is that all industries located on such industrial tracks are given the rates of the city, town, or station where they are located. Such industrial tracks are considered a part of the terminals of the company at that point, and no extra charges are made for delivering freight to such industries. It appears, further,

that no extra charge is made for shipping from an industry on such a track to a foreign point. The roadbed and trackage of a railroad must be viewed as a unit for all purposes of taxation, except as otherwise directed by statute. The rationale of railroad assessment for taxation is nowhere more lucidly expounded than by the late Justice Cooper in *Franklin Co.* v. *N., C. & St. L. Railway*, decided in 1881, and reported in 12 Lea, 521. Judge Cooper stated:

"The property of a railroad company for purposes of taxation consists of its realty, its local personalty, its rolling stock, its *choses* in action, and its franchise. The franchise is the privilege conferred by the charter of incorporation, namely, the right to exercise all the powers granted in the mode prescribed for the purpose of profit. It is a unit not confined to any one county in which it may be exercised. The principal part of the franchise is the right to charge for freight and passengers, the charge being limited with a prescribed or reasonable rate for carriage in the proportion of the distance of transportation. Obviously, after ascertaining the value of the entire franchise in the State as a unit, no more approximate or just division of this value can be made for the purposes of taxation than to allot it among the counties through which the track runs in the proportion of the length of track in the county to the entire length of road in the State. And this is what was done by the acts under consideration."

Again the court says:

"The roadway itself of a railroad depends for its value upon the traffic of the company, and not merely upon the narrow strip of land appropriated for the use of the road and the bars and cross-ties thereon. The value of the roadway at any given time is not the original cost, nor *a fortiori* its ultimate cost after years of expenditure in repairs and improvements. *On the other hand, its value cannot be determined by ascertaining the value of the land included in the roadway assessed at the market price of adjacent lands, and adding the value of the cross-ties, rails, and spikes."*

Again he says:

"The assessable value for *taxation of a railroad track* can only be determined by looking to the *elements on which the financial condition of the company depends, its traffic as evidenced by the rolling stock and gross earnings, in connection with its capital stock.* No *local estimate* of the *fraction in one county of a railroad track* running through several counties can be based upon sufficient data to make it at all reliable, unless, indeed, the local assessors are furnished with the means of estimating the whole road."

Again the court says:

*"No part of the mere roadway can be said to be more valuable than any other part, when considered as a track, for the exercise of the franchises of the company as a common carrier.* It is, like the franchise itself, *a unit for the purposes intended;* these purposes being not merely the use of the road for the profit of the company, but its use for the benefit of the public."

Again the court says:

"The *real estate of a railroad company* other than its roadway, and its personal property having a local *situs,* may stand upon a different footing, *for such property may be estimated and assessed like other similar property of the county, district, or ward where it is situated."* (Italics ours.)

This opinion of Judge Cooper was quoted with commendatory language by the United States supreme court in two cases, namely: *Columbus Southern Railway* v. *Wright,* 151 U. S., 470, 14 Sup. Ct., 396, 38 L. Ed., 238, and *Pittsburg Railway Co.* v. *Backus,* 154 U. S., 421, 14 Sup. Ct., 1114, 38 L. Ed., 1031.

The leading idea advanced by Judge Cooper is that the franchise of a railroad is a unit, and the roadway itself depends for its value upon the traffic of the company, and not merely upon the land and cross-ties. It is true that "the side tracks and switch tracks off the main right of way" are wholly useless and valueless when dissociated from the main line. They are indissolubly connected with the main line, and one cannot be operated without the other. They are a unit in value and in operation, as is well said by counsel. Side tracks and switch tracks off the main right of way are as essential to the operation of the railroad as the side tracks and switches on the main right of way. The order of the railroad commission was that any side track, spur track, and switch, of whatsoever kind, "off the main right of way," regardless of its use, should

be assessed as localized property.   There is no provision in the act of 1897 which justices such a classification.   If the term "roadbed" includes all "side tracks," it includes a side track "off the main right of way" as well as one on the main right of way.   The same may be said of switch tracks, trestles, and bridges.   It is said, however, that the act of 1882 (Laws Ex. Sess. 1882, p. 20, c. 16), which first classified railroad property for purposes of taxation into localized and distributable properties, and under which the railroads were assessed, contained this provision:

"Sec. 4.   Be it further enacted, that the depot buildings, yards, grounds and other property, real, personal and mixed, having an actual *situs,* shall be known as the localized property of such railroad, and shall be valued by the county assessors and city assessors of the several districts and wards in which such property is situated, in the same manner and upon the same principles that govern the assessment of similar property owned by individuals, and it shall be valued by said county assessors and city assessors in the respective counties, towns and cities in which it is located.   The State shall be entitled to a tax upon all such localized property, the counties, towns and cities shall be entitled to a tax upon the value of all such localized property as is situated within their respective limits."

The words "yards and grounds," found in the section quoted from the act of 1882, are claimed to evince the intention of the legislature that switching yards

with side tracks were intended to be classified as localized property. It will be noticed that in the act of 1882 the words "yards and grounds" are used in connection with depot buildings, and were probably intended to refer to depot yards. It is significant that no such construction as is now urged was ever placed on the act of 1882, and that for a period of twenty-five years no tax assessor ever assessed the side tracks or switch tracks "on or off" the right of way as localized property.

It is said in the brief of counsel for the railroad, viz.: "It is a part of the history of the assessment of railroad properties in the State of Tennessee that every board of State assessors from 1882 to 1907 assessed all tracks, including side tracks, spur tracks, and switch tracks, both 'on' and 'off' 'the main right of way,' as a part of the unit known as 'distributable property.' Such assessments were approved by every governor of the State during that period as a member of the board of examiners or equalization."

We are entirely satisfied with the correctness of this statement. But, whatever potency there may have been in the terms "yards and grounds," found in the assessment act of 1882, they were entirely omitted from the act of 1897, under which the present assessment was made. This is shown by a comparison of the two acts, viz.:

Section 4, Act of 1882.

That the depot buildings, yards, grounds and other

property, real, personal and mixed, having an actual *situs,* shall be known as the localized property of such railroad, etc.

Section 8, Act of 1897.

That the depot buildings and other property, real, personal and mixed, having an actual *situs,* shall be known as the localized property of such railroad, etc.

This change in the phraseology of the law removes any ground for the contention that "yards and grounds" covered with tracks should be included under the head of localized property. The words "yards and grounds," having been expressly omitted from the act of 1897, cannot now be read into the latter act for the purpose of covering this feature of the assessment. The other features of the two acts are identical, as will appear from the following parallel columns:

Section 2, Act 1882.

That the roadbed of a railroad shall include all side tracks, switches, trestles, bridges and the ties, rails, fastenings and superstructure of every kind.

Section 6, Act of 1897.

That the road of any railroad property shall include all side tracks, switches, bridges, trestles, ties, rails and superstructure of every kind.

It will be observed that the only difference in these two sections is that the word "roadbed" was used in the act of 1882 where the word "road" was used in the act of 1897. Whether the change was intentional, or a mere inadvertence, is not material. It is conceded

by counsel on both sides that this change was immaterial, and that the words "roadbed" and "road," employed in the two acts, mean substantially the same thing.

Section 3 of the act of 1882 and section 7 of the act of 1897 undertake to define what shall be "distributable property." These two sections are substantially identical in language, viz.:

Section 3, Act of 1882.

That the roadbed, rolling stock, franchises, *choses* in action and personal property of a railroad property having no actual *situs,* shall be known as its distributable property, and shall be valued by said assessors separate from the other property, etc.

Section 7, Act of 1897.

That the roadbed, rolling stock, franchises, choses in action and personal property of a railroad property having no actual *situs,* shall be known as distributable property and shall be valued separately from the other property, etc.

The term "roadbed," under both acts, included all side tracks and switch tracks, wherever situated, and, with the rolling stock, franchises, choses in action, and personal property of a railroad having no actual *situs,* must be assessed separately as distributable property. Again chapter 5, p. 102, of the Acts of 1897 (section 2) requires railroads to file with the State comptroller a schedule, among other things, "setting forth therein the length in miles of its entire roadbed, switches and

side tracks, showing the number of miles lying in this State, in each county of this State, and in each incorporated town in this State, and the "value of the whole." The legislature would not have required a schedule showing the "value of the whole" of "its entire roadbed, switches and side tracks," if switches and side tracks "off the main right of way" were intended to be assessed separately and distinct from the switches and side tracks "on the main right of way."

The principle of assessing side tracks and switch tracks as distributable property, under chapter 5, Acts 1897, was distinctly recognized and enforced in the case of *Kansas City, Ft. Scott & Memphis Railroad* v. *King, Comptroller,* decided by the United States circuit court of appeals at Cincinnati, and reported in 120 Fed., 614, 57 C. C. A., 278. That was a Tennessee case, and involved the construction of the act of 1897, with which we are now dealing. This property was shown to cover a considerable acreage, and included about twenty miles of trackage in the city of Memphis. In its schedules the railroad company reported that two miles of this trackage was main line, and that the remainder consisted of side tracks and switches. In fact, the whole constituted the terminals of said company in the city of Memphis. The total mileage of the railroad returned for taxation consisted of 959 miles, of which the railroad company claimed that 675 miles were main line and the remainder side tracks and switches, including eighteen miles of side tracks and switches in Memphis.

The total valuation placed on the distributable property of the entire line of road (959 miles, including main lines, side tracks, etc.) was about $13,400,000. The commission divided this aggregate amount by the total mileage—both main and side lines—and in order to arrive at a fair and approximate assessment, the proof showing that the property in Memphis was worth at least $250,000, the quotient of $14,000 obtained by this method was, as unit of value, multiplied by the total mileage of all tracks in Memphis, resulting in an assessment of about $250,000.

It was insisted on behalf of the railroad company that the total valuation should be divided by the 675 miles of main line, and that the quotient thus obtained should be multiplied by the two miles of main line, as claimed by it, in Memphis; the result being that the railroad claimed that it could only be assessed upon a valuation of about $38,000 on property shown to be worth $250,000. The assessment actually made was as follows:

The railroad commission of the State of Tennessee, acting *ex officio* as State tax assessors of railroad, telegraph, and telephone properties assessable for taxation in said State, after consideration of the distributable property of the above-named railroad, namely, its rolling stock, franchises, roadbed, side tracks, switches, bridges, trestles, ties, rails, and superstructures pertaining to said roadbed, and all other property of said road other than localized property, for the pur-

pose of assessing the same for taxation, State, county, and municipal, for the years 1899 and 1900, find the terminals of said road to be Kansas City, Mo., and Memphis, Tenn., with 959.50 miles of entire main line, of which there is 21.16 miles of terminal line in Tennessee, and the number of miles as hereinafter set out in each county and municipality of said main line, and compute the value for assessment for taxation of the said distributable·property of the said road, and do so value the same for taxation, State, county, and municipal, for the years 1899 and 1900, as hereinafter set out, to·be apportioned, State, county, and municipal, as hereinafter set out, viz.:

Value of distributable property of entire
    line of road, 959.50 miles .............$13,434,000
Less legal exemptions ...................      1,000
Assessable balance in Tennessee ..........    296,240
Assessable value per mile ...............     14,000

APPORTIONMENT FOR TENNESSEE.

21.16 miles at $14,000 per mile .........      $296,240

APPORTIONMENT FOR COUNTIES—SHELBY.

21.16 miles at $14,000 per mile ..........     $296,240

APPORTIONMENT FOR MUNICIPALITIES—MEMPHIS.

21.16 miles at $14,000 per mile ..........     $296,240

An examination of above assessment will show that the railroad commission assessed all the terminal

tracks, side tracks, and switch tracks of said company
in the city of Memphis as distributable property.   The
real controversy in the case was over the method adopt-
ed for valuing the distributable property.   The com-
pany insisted it had only two or three miles of main
line in Memphis, but on account of the side tracks and
terminal tracks the commission estimated the main line
as 18.18 miles in length.   The court, speaking through
Judge Day, said:

"The terminal property of the appellant is composed
of a large number of tracks, a network in fact, used
to make connections, and to afford storage room for
cars, and the means of handling, receiving, and deliv-
ering freight and making connections—a situation
which may be generally described as embracing the ter-
minal facilities of this railroad at Memphis.   It is in-
sisted for the railroad company that only that small
portion of some two miles connecting with other roads
can be regarded as main line, and included in the 'en-
tire length of the road,' for the purpose of tax distrib-
ution under the statute.   It is claimed that in this way
the statute is consistently carried 'into effect, and this
company taxed by the method which prevails in assess-
ing other railroads in the State.   It appears that in
assessing a railroad traversing the State, which it is
claimed the complainant's does, it has been the practice
to find the 'length of the road' without including side
tracks, and assess the distributable property by mul-
tiplying the value per mile by the number of miles in the

State included in the length of the road as thus obtained.  The practice of taxing distributable property by this mileage method is quite common, and is prescribed by statute in a number of States.  This means of reaching the distributing value of railroad property for the purpose of taxation has met with approval in a number of supreme court decisions.  They are collected in the opinion of Mr. Justice Brewer in *Railroad Co.* v. *Backus,* 154 U. S., 421, 14 Sup. Ct., 1114, 38 L. Ed., 1031."

It will be noticed that the property assessed in that case embraced the terminal facilities of the railroad at Memphis, with a network of tracks used for handling, receiving, and delivering freight, and making connections, and yet it was all assessed as distributable property. There was no insistence that those terminal tracks, side tracks, and switch tracks should be assessed as "localized property."  The court then examined section 7, c. 5, Acts 1897, providing for the assessment of distributable property, and further wrote:

"Undoubtedly, wherever applicable, this rule must be followed, and in most cases it will work substantial justice; but, as was said by Mr. Justice Brewer in *Railroad Co.* v. *Backus,* 154 U. S., 421, 14 Sup. Ct., 1114, 38 L. Ed., 1031, the law does not require that the valuation of the property within the State shall be absolutely determined upon the mileage basis.  In the case at hand, we cannot perceive any reason for calling the connecting part of these terminal tracks main line and the balance side tracks.  We have a situation where the

'length of the road' rule, as construed in practical application to the other roads differently situated, will not afford a means of reaching the value of the property of this company in Tennessee. To treat the two miles as main line, and as furnishing a number by which to multiply the total valuation, divided by the number of miles of main line of the whole road, will value this property at about $39,000—a sum which the testimony discloses to be so far below its true value as to give an absurd preference to this property in taxing railroads in Tennessee. The situation was apparent to the assessors, as their report discloses. While the mileage rule was inapplicable, they were, nevertheless, authorized by the statute to value this and all other property of the company in Tennessee for taxation. This property was not to be valued as a distinct and separate entity, but was to be treated as a part of the system to which it belonged."

There are many authorities from other States to the effect that the side tracks and switch tracks of a railroad are part and parcel of the system, and must be assessed as such under statutes providing a method of valuing railroad property for taxation. In Illinois a statute provided that a State board should assess "the railroad track," and that the local tax assessors should assess all property not "upon the right of way," or not included in the term "railroad track." Section 42 of the revenue law (Hurd's Rev. St. 1908, c. 120) provided as follows:

"Such right of way, including the superstructure of main, side or second track and turnouts, and the station and improvements of the railroad company on such right of way, shall be held to be real estate for the purpose of taxation, and denominated 'railroad track,' and shall be so listed and valued; and shall be described in the assessment thereof as a strip of land extending on each side of such railroad track, and embracing the same, together with all the stations and improvements thereon, commencing at a point where such railroad track crosses the boundary line in entering the county, city, town or village, and extending to the point where such track crosses the boundary line leaving such county, city, town or village."

The collector of McLean county, Ill., undertook to collect taxes on certain land in the city of Bloomington, and the objection urged by the railroad company was that the property was held by the railroad company for its right of way, and was embraced in a class of property denominated by the revenue law as "railroad track," and therefore not assessable by the local assessors. The court says, in speaking of section 42 above quoted:

"What was intended by the enactment of this section of the statute by the use of the words here employed, 'such right of way?' Were these words intended to mean merely the strip of land a certain number of feet wide, upon which the railroad company had constructed its main track, or did the framers of the section in-

tend to embrace, not only the main line of the road, but all side tracks, turnouts, and switches which are connected with the main track, and which are in actual use by the railroad company as a common carrier?

"We can see no reason why the term 'right of way' should be confined to the land over which the main track of a railroad shall be constructed. The land upon which a side track, a switch, or a turnout is built and in actual use by the company in the business for which it was organized, for all practical purposes, is as much held for right of way, as is the land upon which the main track is constructed. In the operation of a railroad, it is necessary that trains should pass each other, and hence the necessity of turnouts, switches, and side tracks. In the loading of cars, transfer of cars, the making up of trains, and in innumerable other instances that might be named, in the prosecution of its business as a common carrier, side tracks, switches, and turnouts are as indispensable to a proper transaction of its business as the main track itself. We are, therefore, of the opinion that the land held and in actual use by a railroad company for side tracks, switches, and turnouts must be regarded, within the meaning of the revenue law, as a part of the right of way of the company. It is used in the transportation of freight, and also for the purpose of carrying passengers, alike with the land upon which the main track is constructed, and upon what principle the land upon which the main track is laid can be held to be right of way, and the

land over which a side track, switch, or a turnout passes can be termed something else, we are at a loss to understand." *Chicago & Alton Railroad Co.* v. *People, ex rel.,* 98 Ill., 356.

This case was reaffirmed by the supreme court of Illinois in the later case of *People, ex rel. City of Chicago,* v. *State Board of Equalization,* decided in 1903, and reported in 205 Ill., 296, 68 N. E., 943. The court said:

"The right of way of a railroad company cannot be cut up, for the purposes of assessment, into parts, either by dividing it into sections by the lines of the different taxing bodies which it crosses, or by severing from its main track the portions that lie outside of some arbitrary line drawn through the center of the right of way. A railroad is a unit, and for the purposes of assessment its right of way must be treated as a whole. The switch or side track at which it receives coal, grain, stock, or freight in a country village is as essential to the successful operation of the road as is the switch or side track in the city at which the articles which it handles as a common carrier are discharged, and the land upon which its side or second track and turnouts, and its station, machine shops, roundhouse, etc., stand, is as necessary to the successful operation of the road and as much a part of the right of way as the land upon which the main track is laid, and the value of each piece of its right of way must be determined by taking into consideration the value of the entire

right of way, rather than the value of each piece for commercial purposes wholly disconnected from the use to which it has been applied, as compared with contiguous property used for purposes other than right of way."

In this case it was urged that such a construction would render the act unconstitutional. This was fully discussed, and the court discarded the idea that it was unconstitutional, and says:

"The method provided in said act for assessing 'railroad track' does not remove real estate used for railroad right of way from within the limits of one taxing body and place it within the limits of another taxing body, but merely establishes a method of valuing the proportionate share of each taxing body through which the road runs, in the right of way as a whole, which, as we have seen, is equitable and just, and that method of assessing railroad right of way has frequently been approved by the courts of this and other States, as well as in the supreme court of the United States." *Porter* v. *Rockford Railroad Co.* (76 Ill., 561), supra; *Law* v. *People*, 87 Ill., 385; *State Railroad Tax Cases*, 92 U. S., 575, 23 L. Ed., 663; *City of Dubuque* v. *C., D, & M. Railroad Co.*, 47 Iowa, 196.

The State of Indiana also has a statute like that of Illinois. In the case of *Pfaff, Auditor*, v. *Terre Haute & Indianapolis R. R. Co.*, 108 Ind., 144, 9 N. E., 93, the facts were that the railroad company owned tracts of land and certain parts of lots in the city of Indian·

apolis, aggregating about twelve acres. Across these
lots certain tracks were laid, used for switching pur-
poses and for the purposes of a roundhouse. These lots
were attempted to be assessed by the local tax asses-
sors under a statute almost precisely similar to that
of the State of Illinois. The Indiana court held that
such lots were a part of the "right of way," or "rail-
road track," in the sense of the statute, and must be
assessed as such. See, also, *State, ex rel.*, v. *Hannibal
R. R. Co.*, 135 Mo., 618, 37 S. W., 532, for the construc-
tion of the Missouri statute, and wherein the court,
among other things, said:

"The tracks in a yard may properly be termed side
tracks, and include the ground necessary for the con-
venient and safe movement of cars, and for loading
and unloading them."

See, also, *State, ex rel.*, v. *Chicago, Rock Island Rail-
road Co.*, 162 Mo., 391, 63 S. W., 495; *St. Louis, Iron
Mountain, etc., Railroad Co.* v. *Miller Co.*, 67 Ark., 498,
55 S. W., 926; *Burlington Railroad Co.* v. *Lancaster
Co.*, 15 Neb., 252, 18 N. W., 71; *Red Willow Co.* v. *Chi-
cago Railroad Co.*, 26 Neb., 660, 42 N. W., 879. The
cases already cited are sufficient to show how, under an-
alogous statutes in other States, side tracks, switches,
and turnouts are regarded in the assessment of the prop-
erties of a railroad system. The railroad is everywhere
regarded as a unit, and the side tracks and switch
tracks as a part of the unit, which are not separately
assessed for taxation but are included in the system. In
this State this matter is not left to construction; but

the statute expressly declares that the roadbed shall include all side tracks, switches, etc., etc. We therefore hold that the circuit court was in error in holding that "side tracks off the main right of way" were properly assessed as localized property. They should have been assessed as distributable property.

It is insisted, however, on behalf of the State, that "even if all the property denominated 'localized property off main right of way' be insufficiently described, and even if it be not 'localized property' under chapter 5 of the Acts of 1897, still it is distributable property, and the State is entitled to its tax on said property."

The above contention of respondent is more particularly set out in their seventh assignment of error as follows:

"The court erred in not sustaining the sixth ground of defendant's motion to quash, to the effect that in any event petitioner is liable for the State tax upon the assessment of petitioner's property in controversy under the name of 'localized trackage,' because the record shows that the amount of said assessment was not included in the assessment of petitioner's 'distributable property,' and, if the same is not assessable as 'localized property,' then the valuation should have been added to the valuation of the distributable property, and so certified. In no event was petitioner entitled to escape the State tax upon the valuation of said property as made and assessed by the State board, and the *supersedeas* should have been modified, so as to allow said valuation to be certified for State tax."

We are of opinion this contention is unsound. As we have held, this property belonged to the distributable class, which is assessed as a unit. There is no authority in the act of 1897 for the separate assessments of side tracks and switch tracks in any county, and then to add that assessment to the valuation of distributable property. The separate assessment of this property as "localized trackage off the main right of way" was absolutely void, and no tax can be collected on such an assessment as distributable property. It should have been included in the general assessment of all distributable property.

While we hold that this trackage and the roadbed on which it is situated must be assessed as distributable property, all buildings, coal bins, roundhouses, machine shops, depot buildings, and other structures located on the terminal yards at Nashville and at Chattanooga, or elsewhere, must be assessed as localized property, and the railroad company should return in its schedule a description of the real estate so far as it is occupied by such buildings. The circuit court quashed the assessment of localized trackage off the main right of way because of vagueness and indefiniteness of description of the property. In this action the court was correct; but he should have further adjudged said assessment void, for the reason that the property assessed as "localized trackage" should have been assessed as "distributable property."

The proper judgment will be entered here, and the costs will be certified to the comptroller for payment.